UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

DENNIS BRATTON, ET AL               CIVIL ACTION NO. 07-0700

VERSUS                              JUDGE HICKS

SUMTER NETWORK DESIGN,              MAGISTRATE JUDGE HORNSBY
INC., ET AL

**REPORT AND RECOMMENDATION**

**Introduction**

Dennis and Linda Bratton ("Plaintiffs") were and may still be owners of 100% of the stock in Sumter Network Design, Inc. ("Sumter"). Plaintiffs filed this civil action in a Bienville Parish state court against several companies and individuals whom they allege entered into business relationships with Sumter but mismanaged or took advantage of the company to the detriment of Plaintiffs. They filed a virtually identical suit in Bienville Parish, and it is now pending in this court as 07 CV 0698.

Plaintiffs (Louisiana citizens) are diverse in citizenship from the several defendants against whom their principal claims are directed. Plaintiffs also named as defendants, however, Sumter (a Louisiana corporation) and First National Bank, N.A. ("FNB") (a Louisiana citizen).¹ The other defendants nonetheless filed a notice of removal based on an

---

¹ The removing parties state, without explanation, that FNB is a Louisiana citizen. For diversity purposes, a national bank is deemed a citizen of the state in which it is located. 28 U.S.C. § 1348. This means that a national bank "is a citizen of the State in which its main office, as set forth in its articles of association, is located." Wachovia

assertion of diversity jurisdiction. They urged that the court could ignore the citizenship of Sumter and FNB based on the improper joinder doctrine. More than one year after the case was removed, FNB filed a motion to dismiss or for summary judgment. Plaintiffs then challenged subject matter jurisdiction for the first time by filing a Motion to Remand (Doc. 59) and a request for expedited consideration. The motion is now fully briefed.

**The Allegations**

Plaintiffs allege that Sumter was incorporated in 1998 and that they owned 100% of Sumter at that time. Plaintiffs allege that they have been "shareholders" of Sumter at all times relevant to this action. Petition, ¶ 2. Sumter provided construction services to telecommunications companies. Mr. Bratton was involved in the Sumter operations until 2004 when he was diagnosed with a serious liver disease that resulted in a hospital stay and, eventually, a liver transplant. ¶¶ 3-4, 33.

Sumter "conducted business" with defendant Bell Canada, through Bell's wholly-owned subsidiaries, defendants Expertech USA and Expertech Canada. Defendant John Dinardo was president of Expertech USA, and defendant Jacques Robichon was the president of Expertech Canada. ¶ 5.

Shortly after Mr. Bratton's liver disease diagnosis, Mr. Dinardo approached Mr. Bratton and solicited the "sale" of Sumter to defendants Pierre Yves Methot and

---

Bank v. Schmidt, 126 S.Ct. 941 (2006). Online information from the Comptroller of the Currency indicates that FNB's main office is in Arcadia, Louisiana.

Steve Rouleau. ¶ 6. Dinardo proposed that Expertech and Sumter (if purchased by Methot and Rouleau) would enter into a joint venture wherein Expertech would provide large contracts for work to be performed by Sumter. Dinardo also "related" that defendant Prestige Telecomm (owned by Methot and Rouleau) would guarantee to Expertech all advances made by Expertech. ¶ 7-8.

An agreement for the purchase and sale of (an unspecified percentage of) Sumter stock was signed by Plaintiffs in 2005, and on information and belief, by the other parties, but Plaintiffs do not have a copy of the agreement. ¶ 9. The purchase price for the sale (an unspecified amount) of Sumter stock was approximately $250,000, less some debts owed by Sumter, and an employment agreement by which Mr. Bratton would receive 15% of net profits earned by Sumter. ¶ 10. The agreement provided "some authority" for Methot and Rouleau to manage or act on behalf of Sumter, and the two men "assumed control of Sumter" in early 2005. ¶¶ 11-12.

Methot and Rouleau hired defendant Richard Herrington as vice president of operations for Sumter. ¶ 16. Herrington soon moved the headquarters of Sumter to Boca Raton, Florida. ¶ 20. The petition makes many of the allegations "on information and belief," or through vague or implied descriptions of matters. One example is that the move to Boca Raton is alleged to have been "possibly in an effort to prevent petitioners from having meaningful access to Sumter's records and information." The undersigned has attempted to summarize the key allegations in a more direct fashion when specific facts are

alleged, but the reader should be aware that the actual petition is filled with such speculative and conclusory allegations.

Sumter, when Herrington was hired, was engaged in two large jobs involving Expertech in Arkansas and Oklahoma. Those jobs became unprofitable "due to mismanagement" by Herrington, Methot, and Rouleau. ¶ 21. Plaintiffs allege that unspecified "defendants" were conspiring to make Sumter a marketable entity so that they could "flip" the company for a huge profit. Defendants misled Plaintiffs (in an unspecified way) in an effort to delay the Defendants' purchase of Sumter while Defendants "mismanaged Sumter for the purpose of inflating its value so that Defendants could then profit from its re-sale." ¶ 23.

Methot and Rouleau agreed with Expertech that Expertech would receive from Sumter 15% of the gross revenue Sumter earned on all jobs that Expertech sent to Sumter. Plaintiffs allege that this agreement was not withstanding the unprofitable nature of certain of the Expertech jobs, and the agreement was detrimental to Sumter and made without the knowledge of Plaintiffs. ¶ 25.

Defendants later agreed that Sumter would pay Expertech 15% of all Sumter gross revenue, regardless of whether Expertech had procured the work. ¶ 27. A balance sheet for 2005 shows that Defendants' actions resulted in a significant increase in Sumter's liabilities. ¶¶ 28-29. Defendants created two or more contracts in an attempt to cover up problems identified by a 2005 audit of Expertech. Methot signed one of the agreements as an officer

of Sumter, though he lacked any real or apparent authority. ¶ 31. Rouleau signed another document as president of Sumter, but he was never an officer of the company. ¶ 32.

By spring of 2006, Expertech owed Sumter $800,000 to $1,000,000 for completed work. Plaintiffs allege that Sumter "is entitled to be paid the sums due for the work performed by Sumter" and other sums due from Expertech or Bell Canada. ¶ 35.

Methot, Rouleau, and Herrington "coerced" Plaintiffs (through unspecified methods) to sign a purchase agreement that purported to transfer to defendant 4307071 Canada, Inc. 600 to 1,000 shares of Sumter stock. Plaintiffs allege that the agreement does not state a price or consideration paid for the stock, and that no consideration was actually paid. ¶¶ 37-38. Plaintiffs then state that they signed the document based on promises that Methot and Rouleau could obtain payment of the money that Expertech owed Sumter, but the payments were never procured. ¶ 39. Plaintiffs also attack the agreement based on error, duress, and fraudulent representations. ¶ 42.

Sumter's financial problems caused by Defendants resulted in the closing of the business. Plaintiffs later learned that Defendants sold, lost, or converted trucks and construction equipment that belonged to Sumter and Plaintiffs, sometimes by means of forged documents. ¶¶ 44-46. Defendants also forged Mr. Bratton's name on several credit card accounts, some of which contained unauthorized charges for trips to Hawaii and other excesses not related to legitimate Sumter operations. ¶ 47. Plaintiffs allege that Herrington

took equipment that belonged to Sumter or Plaintiffs for an unrelated entity that was engaged in competition with Sumter. ¶ 48.

FNB, an Arcadia bank, is not alleged to have been a part of these many misdeeds. Rather, the only allegations directed at FNB are found in Paragraph 30 of the petition. It alleges as follows:

> As DENNIS BRATTON awaited a liver transplant during the fourth calendar quarter of 2005, Herrington began to issue NSF checks from Sumter. Defendant FNB repeatedly paid these checks, without authority from petitioners, only to contact petitioners and then require them to reimburse FNB with petitioners' personal funds. Petitioners paid approximately $460,000 to cover checks and fees/penalties incurred as a result of the actions of Herrington and FNB.

The next task is to determine whether the claims against Sumter and FNB were improperly joined.

**Improper Joinder**

Congress has provided a statutory framework for removal of certain cases where there is diversity of citizenship. Those statutes have been interpreted by the courts to require complete diversity; jurisdiction is lacking if any defendant is a citizen of the same state as any plaintiff. That strict requirement would, on its face, permit a plaintiff to name as a defendant any citizen of his home state and defeat removal. To prevent such shams, the "judge-imported concept of fraudulent joinder" has developed. Bobby Jones Garden Apartments, Inc. v. Suleski, 391 F.2d 172, 176 (5th Cir. 1968). The Fifth Circuit has recently adopted the term "improper joinder" to describe the doctrine, though it took care to note that

there is no substantive difference between the two terms. Smallwood v. Illinois Central R.R. Co., 385 F.3d 568 n. 1 (5th Cir. 2004) (en banc).

There are two ways to establish improper joinder: (1) actual fraud in the pleading of jurisdictional facts or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court. Only the second way is at issue in this case. That second test asks whether the defendant has demonstrated there is no reasonable basis for the district court to predict the plaintiff might be able to recover against the in-state defendant. Smallwood, 385 F.3d at 573; Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003).

The "no reasonable basis" contest may take place in two different settings. In the first, the defendant challenges the adequacy of the plaintiff's pleadings, without the submission of evidence. The court conducts a Rule 12(b)(6)-type analysis to determine whether the complaint states a claim under state law against the in-state defendant. Smallwood, 385 F.3d at 573. Any ambiguities in state law must be resolved in favor of the plaintiff. Gray v. Beverly Enterprises-Mississippi, Inc., 390 F.3d 400, 405 (5th Cir. 2004).

But merely pleading a valid state law claim, or one whose validity is reasonably arguable, against the resident defendant does not necessarily mean that the joinder of the resident defendant is proper. The second setting for the "no reasonable basis" contest permits the defendant to challenge the plaintiff's allegations and attempt to demonstrate by summary judgment-type evidence that the plaintiff is unable to prove all of the facts necessary to prevail. The court has discretion in those circumstance to pierce the pleadings

and analyze the improper joinder claim based on that evidence. Hornbuckle v. State Farm Lloyds, 385 F.3d 538, 542 (5th Cir. 2004).

**Improper Joinder of Sumter**

The removing defendants' notice of removal makes four arguments for why the joinder of Sumter as a defendant is improper. Two of the arguments attack the ability of Plaintiffs to assert a shareholder derivative action against the corporation in which they hold stock. A derivative action is a case in which a shareholder brings suit to enforce a right on behalf of a corporation when the corporation refuses to enforce the right. La.C.C.P. Art. 611. There is no suggestion in the petition that Plaintiffs are urging a derivative action, and Plaintiffs make no argument in their motion to remand that they have asserted a derivative action. They do not concede the point, but they assume arguendo that a derivative action would be defective, and they make no argument that there is a viable derivative action presented by the petition. See Doc. 62-3, p. 6. Later, in response to an argument that Sumter should be aligned by the court as a plaintiff, Plaintiffs argue that La. C.C.P. Art. 615(3) requires that a corporation be joined as a defendant in a derivative action. The article cited by both parties states that it refers to a petition in a "class action" brought by a shareholder, but a respected treatise states that the requirements apply in "any type of shareholder derivative suit, whether class-action or joinder-based." 8 Louisiana Civil Law Treatise, Business Organizations, § 34.05 (2008).

Plaintiffs give no indication in their petition that it is intended as a derivative suit, and the petition does not satisfy the procedural requirements of Article 615, such as alleging with particularity the efforts of the plaintiff to secure from the management of the corporation the enforcement of the right at issue. The petition's prayer also fails to include a prayer for judgment in favor of the corporation. Rather, Plaintiffs pray for judgment against Sumter for all sums just and reasonable (but without specificity of the basis of the claim). Under these circumstances, no viable derivative action has been asserted, so the court need not discuss the improper joinder issue further within the context of such a claim.

Defendants also argue that Plaintiffs are owners of 100% of the stock in Sumter and cannot sue Sumter because Plaintiffs and the corporation "are one and the same." Defendants add a general assertion that the court should ignore that the corporation is a separate entity, implying that the mere allegation that Plaintiffs used personal funds to pay some corporate NSF checks is sufficient indicia of commingling for the court to pierce the corporate veil without further consideration. That is a bit much, as is the repeated assertion by Defendants that Plaintiffs have at all times been owners of 100% of the shares of Sumter. That may prove to be the case, but it is not clear from the petition. Plaintiffs allege that they were initially 100% owners and were thereafter "shareholders." They also allege an agreement to disburse shares to others, as well as that other persons were "in control" of the corporation by unspecified means. The validity of the stock transfer agreement is attacked by Plaintiffs, but the court cannot adjudicate that matter on mere pleadings review. There

is, despite the adamant assertions of Defendants, at least ambiguity as to the percentage of ownership Plaintiffs had in Sumter at the time they filed this suit.

Defendants' next argument is the clincher. Plaintiffs did not articulate a viable claim against Sumter in their petition. Sumter is included in the list of defendants against whom Plaintiffs seek relief, but Plaintiffs do not articulate a valid basis to obtain a judgment against Sumter. Plaintiffs argue in their motion to remand that they have claims against Sumter under La. Civ. Code Articles 2302, 1795, and 3048. Article 2302 allows a person to reclaim payment if he has "paid the debt of another person in the erroneous belief that he was himself the obligor." The person who made the payment "has a recourse against the true obligor." There is no allegation in the petition, however, that Plaintiffs covered Sumter's NSF checks based on the erroneous belief that Plaintiffs were personally the obligors on the checks. Plaintiffs argue, in response to a motion to dismiss and for summary judgment, that a bank officer represented to Plaintiffs that they were personally liable for the overdrafts, but there is no hint of such a claim in the state court petition, and the assessment of improper joinder is determined only in reference to the claims set forth in the petition at the time of removal. May v. Texaco, Inc., 73 Fed. Appx. 78 (5th Cir. 2003); Cavallini v. State Farm, 44 F.3d 256, 264 (5th Cir. 1995). Plaintiffs need not have pleaded legal theories by name in their state court petition, but they must have at least asserted facts that would give rise to a colorable claim under such theories. The state court petition does not contain facts to support a claim under Article 2302.

Civil Code Art. 1795 provides the general rule that an obligee may demand the whole performance from any of his solidary obligors. Plaintiffs do not explain how this general rule gives rise to a cause of action against Sumter. Obviously, there must be an underlying obligation before the rule would be applicable.

Civil Code Art. 3048 states that a surety who pays the principal obligation is subrogated to the rights of the creditor. Once again, this article assumes a principal obligation and that one is a surety. "Suretyship must be express and in writing." La. Civ. Code Art. 3038. Plaintiff has not alleged any agreement by which it was a surety for Sumter with regard to the NSF checks.

Persons who have an interest in a business may choose to use their personal funds to cover obligations of the business so that it may stay afloat and enjoy a good commercial reputation. But when a person chooses to take such a step, he does not automatically have a cause of action against the business. Similarly, if an individual were to bounce a check and a friend, relative, or even a stranger should decide to do him a favor and cover the check, the person did the favor does not automatically gain a cause of action against the person who wrote the bad check. That is the scenario alleged in the petition that governs this analysis. Defendants have demonstrated that Plaintiffs have no reasonable possibility of recovery against Sumter based on the facts alleged in the petition, so Defendants have satisfied their burden of establishing that Sumter was improperly joined and that its citizenship may be ignored.

**Improper Joinder of FNB**

Plaintiffs' only allegations against FNB in their petition are that Herrington issued NSF checks from Sumter, FNB paid the checks, and FNB contacted Plaintiffs to "require them to reimburse FNB with petitioners' personal funds." Plaintiffs do not pretend to have a claim against the bank for paying Sumter's checks. Louisiana's version of the UCC provides that a bank may charge against the account of a customer an item that is properly payable from the account, even though the charge creates an overdraft. La.R.S. 10:4-401. Plaintiffs do not allege that Herrington was unauthorized to issue the checks, and they state in one filing that they "believe that Defendant Richard Herrington was authorized to sign checks on Sumter's FNB bank account" at the relevant time. See Doc. 63-2, p. 5.

Plaintiffs, in their motion to remand, set forth a list of statutes and code articles based on which they purport to have a claim against FNB. Plaintiffs do not, however, explain the factual basis of the claims within the context of the statutes and articles, nor do they cite any jurisprudence that has recognized such a claim in a similar setting. Rather, they simply cite the statutes and code articles. The first is La.R.S. 10:3-403(a), which provides that "an unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of a person who in good faith pays the instrument or takes it for value." That article would provide a person with a claim against the signer of an unauthorized check if the person took the unauthorized check in good faith, but it has no apparent application to Plaintiffs. Plaintiffs next refer to general duties of good faith under the obligations articles such as Civil

Code Articles 1759 and 1983. Plaintiffs have not, however, identified any contract or enforceable obligation between Plaintiffs and FNB that FNB did not perform in good faith. Plaintiffs next list "negligent misrepresentation under Louisiana Civil Code article 2315," but they offer no explanation beyond the quoted language. The petition does not suggest any claim based on negligent misrepresentation, and it is the petition that governs for these purposes. Finally, Plaintiffs refer to Article 2302 (Reclamation of payment for debt of another erroneously paid), but again there is no basis in the petition for such a claim. Plaintiffs do not allege that they erroneously believed that they were personally obligated to pay overdrawn checks written by Sumter. Plaintiffs do testify in affidavits filed in opposition to the motion for summary judgment that an FNB officer misled them into believing that they were liable for the checks, but there is no such claim set forth in the state court petition. Defendants have, therefore, established that Plaintiffs' claims against FNB were improperly joined in this action; FNB's citizenship may be ignored for diversity purposes.

**Conclusion**

The undersigned has reviewed the relevant submissions and determined that Defendants carried their burden of establishing that Plaintiffs have no reasonable possibility of recovery from FNB or Sumter based on the state court petition. A finding of fraudulent joinder is tantamount to granting summary judgment dismissing the defendant who was fraudulently joined. See Carriere v. Sears, Roebuck & Co., 893 F.2d 98, 102 (5th Cir. 1990)("summary judgment will always be appropriate in favor of a defendant against whom

there is no possibility of recovery"). All claims against Sumter and FNB should be dismissed.

Accordingly;

**IT IS RECOMMENDED** that the Motion to Remand (Doc. 59) be **denied**.

**IT IS FURTHER RECOMMENDED** that all claims against Sumter Network Design, Inc. and First National Bank, N.A. be **dismissed with prejudice**.

**IT IS FURTHER RECOMMENDED** that the Motion to Dismiss or in the Alternative for Summary Judgment (Doc. 54) filed by First National Bank, N.A. be **denied as moot**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court.  See <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 4th day of August, 2008.

*[signature]*
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE